546 A.2d 1131

**Anthony CUCCHI and Grace Cucchi, H/W,**

v.

**ROLLINS PROTECTIVE SERVICES COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 9, 1988.

Filed Aug. 11, 1988.

10

12

Maria Zulick, Philadelphia, for appellant.

Richard F. Furia, Philadelphia, for appellees.

Before CIRILLO, President Judge, and TAMILIA and HESTER, JJ.

CIRILLO, President Judge:

This is an appeal from a judgment entered in the Court of Common Pleas of Delaware County in favor of the appellees, Anthony and Grace Cucchi.

On July 19, 1973, Anthony Cucchi signed a written contract with the appellant Rollins Protective Services Company (Rollins) for the installation and maintenance of an alarm system in his family residence. The contract provided that Rollins would deliver and install a "protective system" in the Cucchis' home and would "service the system from time to time as needed and when called upon by Customer and [would] ... make all repairs to the system ... needed as the result of normal and proper use." The contract also stated that the protective system would continue to be the personal property of Rollins and that upon termination of the agreement, the customer would immediately return the system to Rollins. Additionally, the contract required that the customer accept Rollins' service for an initial term of three years; thereafter, the agreement would automatically renew itself from year to year unless either party notifed the other thirty days before its expiration.

Although one of Rollins' branch office representatives signed the contract, it was never signed by a representative of Rollins' home office. The contract expressly stipulated that it would "not be binding upon Rollins until accepted at Rollins' Home Office." Nevertheless, Rollins installed an alarm system in the Cucchi residence and continued to maintain it. The Cucchis made an initial payment of five hundred dollars toward the cost of the system followed by twelve to eighteen monthly payments. Thereafter, the Cucchis paid a monthly maintenance charge.

On February 2, 1984, the Cucchis' home was burglarized resulting in the loss of property valued at $36,018.00. On October 30, 1985, Anthony and Grace Cucchi filed an action against Rollins to recover the damages they sustained as a result of the burglary. In their complaint, they alleged counts of negligence, strict liability, and breach of express and implied warranties. They attached the contract that Mr. Cucchi signed with Rollins as well as the cancelled checks showing their payments to Rollins to their complaint, incorporating them by reference therein.

In its answer, Rollins denied the Cucchis' allegations of liability, but acknowledged the parties' written agreement. In new matter, Rollins alleged that the Cucchis' suit was time-barred and that they had failed to state a cognizable cause of action. Rollins also asserted that if the Cucchis could prove any of their liability claims, their damages were limited to ten percent of the annual service charge under the contract or $250.00, whichever sum was greater. In support of this assertion, Rollins quoted the exculpatory or limiting clause of the contract, which stated "that if loss or damage should result from the failure of performance or operation or from defective performance or operation or from improper installation or servicing of the system, that Rollins' liability ... shall be limited to a sum equal to ten percent of one year's service charge or $250.00, whichever sum is the greater...." The Cucchis replied by denying Rollins' statute of limitations and exculpatory clause defenses as mere conclusions of law. Thereafter, Rollins moved for summary judgment asserting the written contract's exculpatory clause and the statute of limitations, and attacking the Cucchis' strict liability count. In response to Rollins' motion, the Cucchis argued that the written contract was not binding because it had not been signed by a representative of Rollins' home office. The trial court granted summary judgment to Rollins on the strict liability count, but denied it on the others.

When trial began, Rollins moved to admit the parties' written contract in its entirety as a judicial admission.

Although recognizing that the Cucchis had averred the existence of a written agreement in their complaint, the court denied the motion because neither Grace Cucchi nor a Rollins' home office representative had signed the document. The court maintained that "the written agreement ... is not the agreement upon which this litigation is going forward."

During the trial, Anthony Cucchi testified that Rollins' salesman had represented to him that the alarm system would do what he wanted it to, which was to provide safety, and told him that "the system was state of the art" and "almost unbeatable." In addition, he tesified that Rollins did all the maintenance work on the alarm system, and that the last maintenance check was done on January 13, 1984, which was less than one month before the burglary. Grace Cucchi testified that she recalled activating the alarm system before she left the house for work on the day of the burglary. Corroborating this fact, the Cucchis' daughter testified that when she discovered that her parents' home had been burglarized, the alarm system was not operating despite the fact that she noticed that it had been activated. The Cucchis' daughter further stated that she had tested the alarm system by opening and closing the back door, which she found open when she arrived home, but that the alarm was not triggered. The Cucchis testified that they also had tested the alarm system on the night following the burglary and again on the following day, and found that the system worked only intermittently.

At the close of the evidence, Rollins moved for a directed verdict on the express warranty and negligence counts. The trial court granted the motion insofar as the negligence count, but found an express oral warranty in "the testimony to the effect that the system would provide safety." Prior to the court's charge to the jury, Rollins again sought a directed verdict on the Cucchis' breach of warranty claim, this time arguing that the claim was time-barred by the four year statute of limitations contained in the Uniform Commercial Code. The court denied this motion. Rollins

also requested leave to amend its answer to the Cucchis' complaint to include the statute of frauds defense; the court refused this request stating that it was untimely. The jury returned a verdict of $20,000.00 for Grace Cucchi and $10,000.00 for Anthony Cucchi. Rollins filed post-trial motions, which the court denied. Judgment was entered on June 25, 1987, and this timely appeal followed.

Rollins raises the following four issues for our review: (1) whether the trial court erred in ruling that the parties' written contract was not binding when the parties relied in their pleadings on the terms of the written agreement and acted under it; (2) whether the trial court erred in denying Rollins' motion for a directed verdict on the Cucchis' warranty claims since the evidence did not establish a breach of express warranty; (3) whether the trial court erred in ruling that Rollins opened the door to evidence regarding subsequent repairs in its opening statement when the court had precluded the introduction of such evidence at the beginning of trial; and (4) whether the trial court erred in precluding Rollins from asserting its Uniform Commercial Code defenses of the statute of limitations and statute of frauds when the evidence supported these defenses.

Rollins challenges the court's refusal to accept the written contract as a judicial admission because of its determination that the written contract was not binding on the parties. It raises two arguments in support of this challenge. Rollins raises these arguments because the trial court's refusal prevented Rollins from limiting its liability to the amount provided for in the written contract's exculpatory clause.

First, Rollins asserts that since both parties acknowledged the existence of the written contract in their pleadings, the court was required to accept the contract in its entirety as a judicial admission. Second, Rollins contends that Grace Cucchi's signature was not required to bind her to the written contract because the law of our Commonwealth presumes the power of either spouse to act for property held in the entireties without the other's express

covenant so long as the benefit of the action involved inures to both. We find Rollins' arguments to be unsupported.

The well-established rule regarding judicial admissions is that "admissions of fact in pleadings are admissible, but that the pleader's conclusions of law are not admissions of facts in issue." *Srednick v. Sylak*, 343 Pa. 486, 492, 23 A.2d 333, 337 (1942). The function of contract interpretation and construction has repeatedly been held to be a question of law for the court to decide. *Durkin & Sons, Inc. v. Nether Providence Township School Authority*, 314 Pa.Super. 131, 460 A.2d 800 (1982) (citing *National Products Co., Inc. v. Atlas Financial Corp.*, 238 Pa.Super. 152, 158, 364 A.2d 730, 733 (1975)); *see also Whitmer v. Bell Telephone Co.*, 361 Pa.Super. 282, 286 n. 3, 522 A.2d 584, 586 n. 3 (1987) (noting that while in ruling upon a demurrer the trial court was bound to accept as true the allegation that the appellant lifted the receiver with intent to purchase a telephone call, it was not bound to accept appellant's conclusion of law that contractual relations were thereby established). Furthermore, in determining whether a particular averment in a pleading is a conclusion of law or an allegation of fact, the trial court has wide discretion. *City of Philadelphia v. Kane*, 63 Pa.Commw. 643, 438 A.2d 1051 (1982).

■ In the case at bar, the fact that both parties may have initially believed the written contract to be binding upon themselves did not make it so. Rather, the question of whether the written agreement was binding upon them was an issue of law for the court to decide. The trial court correctly ruled that the parties' acknowledgment of and reference to the written agreement in their pleadings did not mandate its acceptance as a judicial admission.

■ Moreover, the trial court properly determined that the contract was not binding upon the parties because it lacked the signature of one of Rollins' home office representatives. In *Franklin Interiors v. Wall of Fame Management Co.*, 510 Pa. 597, 511 A.2d 761 (1986), the supreme court ruled on this exact issue. In that case,

appellee Franklin Interiors filed a complaint in confession of judgment against appellants pursuant to a warrant of attorney contained in a written contract. Although the contract contained a provision stating that "[t]he document does not become a contract until approved by an officer of Franklin Interiors," the appellee's signature had not been affixed to the contract. The supreme court first determined that the formation of a valid contract was expressly conditioned upon the written approval of the appellee. The court stated:

> At best, the document of record, without more, is nothing other than an offer by Appellants to deal with Appellee under the terms and conditions of the written offer. Until accepted by the Appellee in the mode and manner expressly provided by the terms of the offer, this document remains an unaccepted offer and cannot, in itself, be considered a binding contract.

*Id.* 510 Pa. at 600, 511 A.2d at 762. The supreme court then went onto address the issue of whether the warrant of attorney included in an unaccepted written offer could be used against the appellants on the basis that there had been oral acceptance or acceptance by performance. The court answered this question in the negative. In doing so, the court first noted that because the appellee supplied the document and terms therein, it had to be presumed that the appellee knew the effect of the unambiguous terms and conditions of its own document. Second, the court quoted the rule of construction that a written instrument must be strictly construed against its maker. Applying these two principles, the supreme court concluded that since the appellee had failed to follow its own conditions of acceptance, the appellee could not rely on the confession of judgment clause. Finally, the supreme court stated that although it had always been the law that only the party against whom a warrant is intended to bind must sign it because the law assumes assent of the person in whose favor it is drawn, the law was of no avail to the appellee. No assumption could be made that the appellee assented to the warrant

because it expressly conditioned acceptance of all the contract terms upon its execution of the document.

■ Applying the supreme court's rationale and ruling to the instant case, we hold that the written contract is not binding upon the Cucchis because Rollins never accepted the contract at its home office. Furthermore, because Rollins never assented to the contract in the manner it expressly provided for, we cannot assume that Rollins assented to the exculpatory provision contained therein. Consequently, the exculpatory provision is not binding against the Cucchis.

■ Next, Rollins questions the propriety of the trial court's refusal to grant Rollins' motion for a directed verdict on the Cucchis' breach of warranty claims. As part of this question, Rollins raises a number of subissues, several of which were either not included in Rollins' post-trial motion or, although included in the post-trial motion, were not briefed. Only issues specifically raised in post-trial motions are preserved for our review. *Commonwealth v. Beckham*, 349 Pa.Super. 430, 503 A.2d 443 (1986). Moreover, even though an issue is contained in a post-trial motion, unless it is briefed or argued during the post-trial proceedings, the issue is waived for purposes of appellate review. *Commonwealth v. Holzer*, 480 Pa. 93, 100–01, 389 A.2d 101, 105 (1978). We will limit our review to those issues which were properly preserved.[1]

1. We will not review Rollins' assertion that although the jury found that Rollins breached an express warranty and implied warranties for fitness for a particular purpose and of merchantability, the Cucchis' claims of breach of warranties were not supported by the evidence. Although Rollins raised this issue in its post-trial motion, Rollins did not argue it in its brief. Nor will we address Rollins' contention that the evidence, which the Cucchis introduced, presented a reasonable secondary cause for the alleged malfunction of the alarm system. This contention was not specifically raised in Rollins' post-trial motion nor subsequently argued in its brief. Last, we refuse to consider Rollins submission that even if its salesman's statement that the alarm system would "provide safety" constituted an express warranty, the warranty was not breached simply by the fact of the burglary. Again, this contention was not raised before the trial court.

Rollins argues that the trial court erred in its warranty instruction to the jury. The court charged that the Cucchis could prove breach of warranty "merely by showing the occurrence of a malfunction of the product during normal use. The plaintiff need not prove the existence of a specific defect in the product." Rollins complains that this charge applies only to products liability claims.

Where the grounds alleged as error are statements made by the trial judge in the charge to the jury, our scope of review is limited to a determination of whether the court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. 16 Standard Pa. Practice 2d § 91:75 (1983). We find that the court's charge was an accurate statement of the law. In *Greco v. Bucciconi Engineering Co.*, 283 F.Supp. 978 (W.D.Pa.1967), *aff'd*, 407 F.2d 87 (3d Cir.1969), the district court determined that under Pennsylvania law, § 402A actions are governed by the same evidentiary standards as warranty actions. Subsequently, in *MacDougall v. Ford Motor Co.*, 214 Pa. Super. 384, 257 A.2d 676 (1969), this court held that *Greco* was a correct statement of Pennsylvania law. We stated, "Three landmark Pennsylvania decisions on products liability clearly affirm *Greco* 's finding that the elements of breach of warranty and § 402A are identical." *Id.* 214 Pa.Super. at 388, 257 A.2d at 678. Summarizing the law on breach of warranty, we noted that:

Proof of the specific defect in construction or design causing a mechanical malfunction is not an essential element in establishing breach of warranty. "When machinery 'malfunctions,' it obviously lacks fitness regardless of the cause of the malfunction. Under the theory of warranty, the 'sin' is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer in constructing or designing the machinery."

*Id.* 214 Pa.Super. at 389, 257 A.2d at 679 (citations omitted). We find that the trial court's charge adequately embraced the law of warranty as summarized above. The court

correctly instructed that proof of a specific defect in the alarm system was not required to prove breach of warranty, but that proof that the system malfunctioned was.

■ Rollins also objects to that portion of the court's charge wherein the court instructed that if Rollins' salesman told Mr. Cucchi "that the system would provide safety, that, if made and it will be up to you to decide whether or not the salesman said that, that would constitute, would qualify as an oral expressed warranty." Specifically, Rollins argues that the charge was improper because it emphasized Mr. Cucchi's testimony. This argument lacks merit. As noted by the trial court, when instructing a jury, a trial judge has the discretion to summarize the evidence adduced at trial. *Noecker v. Johns–Manville Corp.*, 355 Pa.Super. 463, 513 A.2d 1014 (1986). Furthermore, "a trial judge should comment on the evidence relating to the issues in the case, and the attention of the jury should be directed thereto in a way which will impress it upon their minds." 10 Standard Pa. Practice 2d § 59:34 (1982). In this case, the trial judge merely highlighted the only statement that he had heard introduced into evidence which would qualify as an oral express warranty. Moreover, he emphasized to the jurors that the question of whether the statement had actually been made was up to them. The court's statement did not unduly prejudice the jury by placing undue weight upon the judge's recollection of the testimony.

■ As its third issue, Rollins argues that the trial court erred when it allowed the introduction of evidence on subsequent repairs to the alarm system. Rollins moved prior to trial for the preclusion of evidence of subsequent repairs to the alarm system, citing Ms. Cucchi's deposition testimony on the replacement of the transmitter at the back door. The trial court granted the motion. In his opening statement, however, Rollins' trial attorney noted that one of his witnesses' would testify that in January of 1984 as well as after the burglary, he checked the alarm system and found that it worked on both occasions. The Cucchis' attorney objected, claiming that the statement of counsel as to the

system's adequate operation violated the court's ruling on evidence of subsequent repairs. The trial court agreed that Rollins had opened the door on subsequent repair evidence and ruled that if Rollins could introduce such evidence, then so could the Cucchis.

Our consideration of this issue convinces us that the trial court's ruling was correct. Indeed, in the case of *Jamison v. Ardes*, 408 Pa. 188, 182 A.2d 497 (1962), our supreme court stated: "It would be most inequitable to permit appellant to offer evidence favorable to herself in an area not hitherto presented for consideration by the jury, and then prevent appellee from counteracting the effect of this evidence." *Id.* 408 Pa. at 192, 182 A.2d at 498. The logic of the supreme court's statement in *Jamison* applies equally well to the case at hand.

Lastly, Rollins contends that the trial court erred in precluding Rollins from asserting the Uniform Commercial Code's statute of frauds and statute of limitations as defenses. Rollins claims that the evidence clearly supported these defenses and that they were timely raised. We will address Rollins contention as it relates to the statute of frauds and the statute of limitations separately.

The statute of frauds under Pennsylvania's Commercial Code requires contracts for the sale of goods for the price of $500 or more to be in writing. 13 Pa.C.S. § 2201 (1984). Rollins moved to amend its answer to raise the statute of frauds defense at the close of the evidence. The trial court refused to allow the amendment on the basis that it was "untimely." Rollins argues that it did not have a reason to raise the defense of the statute of frauds until trial because it was not until the trial that the court, on its own motion, decided that the written contract was not controlling. Without determining whether the statute of frauds as contained in Pennsylvania's Commercial Code would even apply in this case, we find that Rollins' arguments, rather than pursuading us that Rollins should have been given leave to amend its complaint, convince us of the opposite.

Initially, we note that the trial court's discretion to allow amendments of pleadings under Pa.R.C.P. 1033 is limited only to a consideration of whether or not it might unduly prejudice an adverse party. *Sullivan v. Allegheny Ford Truck Sales*, 283 Pa.Super. 351, 423 A.2d 1292 (1980). At the beginning of the trial, the court ruled on Rollins' motion *in limine* to move the written contract into evidence as a judicial admission. In denying this motion, the court expressly stated that the written contract was not the agreement upon which the litigation was going forward. At the time the court made this statement, Rollins should have requested leave to amend its answer to include the statute of frauds. Instead, Rollins waited until immediately before closing arguments were to begin on the last day of trial to make its request, thus denying the Cucchis any opportunity to introduce evidence in response to the defense. Clearly then, if Rollins had been given leave to amend its answer to include the statute of frauds as a defense, the Cucchis would have suffered undue prejudice. Given this consideration, we can only conclude that the trial court was entirely within the bounds of the law when it denied Rollins' request.

We turn now to Rollins' contention regarding the defense of the statute of limitations. In its answer to the complaint and again in its motion for summary judgment, Rollins averred that the Cucchis' suit was time-barred. The trial judge disagreed, refusing to grant summary judgment on this issue. Thereafter, Rollins renewed its statute of limitations argument in its motion for a directed verdict. This time, Rollins asserted more specifically that the Cucchis' warranty claims were barred because they were not brought within four years of the accrual of their cause of action, as required by the Uniform Commercial Code–Sales' provision, 13 Pa.C.S. § 2725, which states:

(a) General rule.—An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement

the parties may reduce the period of limitation to not less than one year but may not extend it.

(b) Accrual of cause of action.—A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

*Id.* This provision applied to the Cucchis' warranty action, Rollins argued, because the installation and maintenance of the alarm system was a sale of goods within the meaning of the U.C.C. based on this court's ruling in *LoBianco v. Property Protection, Inc.*, 292 Pa.Super. 346, 437 A.2d 417 (1981). Consequently, Rollins stated, since the alarm system was delivered in 1973, the Cucchis' 1985 warranty action was time-barred.

The trial court, although refusing to determine whether the lease agreement between the Cucchis and Rollins was a sale of goods within the meaning of the U.C.C., concluded that the Cucchis' action was filed within the U.C.C.'s four year statute of limitations period. In doing so, the trial court noted that no warranty of future performance existed, but held that the contract was an oral lease, renewed each time the Cucchis sent their monthly payment to Rollins. With every renewal of the lease, the court reasoned, the four-year statute of limitations period began to run anew.

Discussing this issue again in its opinion filed pursuant to Pa.R.A.P. 1925, the trial court quoted the provisions of the U.C.C. regarding the statute of limitations for warranty actions and then stated:

The evidence ... established that the agreement between the [Cucchis] and [Rollins] was a lease at will. At the conclusion of each month, either party was free to terminate the agreement. Accordingly, the payment by the

[Cucchis] of the monthly fee and the acceptance thereof by [Rollins] constituted a renewal of the lease at will and a new transaction in goods. Therefore, with a new transaction in goods occurring monthly, the Statute of Limitations also began to run anew at the commencement of each lease renewal period.

The U.C.C. provision regarding the statute of limitations for warranty claims is contained in the U.C.C.'s division on sales [hereinafter Article 2]. Section 2101 of Article 2, which defines the scope of Article 2, provides that "unless the context otherwise requires, this division applies to *transactions in goods....*" 13 Pa.C.S. § 2101 (emphasis added). In addition, the statute of limitations section in dispute specifically states in its title that it is the "[s]tatute of limitations in *contracts for sale."* 13 Pa.C.S. § 2725 (emphasis added). Accordingly, to resolve the issue of whether the trial court erred when it refused Rollins' requests for motions regarding the U.C.C. statute of limitations, we must first determine whether the lease agreement between the parties constituted a "transaction in goods" and a "sale" under Article 2.

■■■ Although the U.C.C. does not define "transaction in goods" or "transaction," it does define the term "goods." Under the U.C.C., "goods" are "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale...." 13 Pa.C.S. § 2105(a). "Contract for sale" as defined by the U.C.C. "includes both a present sale of goods and a contract to sell goods at a future time." 13 Pa.C.S. § 2106(a). A "sale" is further defined as "the passing of title from the seller to the buyer for a price...." *Id.* The evidence introduced at trial in this case clearly reveals that the alarm system was only *leased* to the Cucchis: the system's title was to remain with Rollins during the time it was installed in the Cucchis' residence as well as afterwards. Thus, applying the plain wording of the statute, the lease agreement between the parties was neither a "transaction in goods" nor a "sale." *See R & W Leasing v. Mosher,* 195 Mont. 285, 636 P.2d 832

(1981) (lease agreement not within definition of sale under U.C.C.); *Leake v. Meredith*, 221 Va. 14, 267 S.E.2d 93 (1980) (bailment or chattel lease transactions not included within definition of sale or contract under the U.C.C.); 1 R. Anderson, Uniform Commercial Code § 2–102:11 (3d ed. 1981) ("By strict analysis, a lease of personal property is not a sale of goods and therefore Article 2 of the Code is not applicable.")

As stated above, during trial Rollins contended that pursuant to *Lobianco v. Property Protection, Inc., supra,* the lease agreement between the parties constituted a sale within the meaning of the U.C.C.. In their brief to this court, the Cucchis have indicated the same. In *Lobianco,* we held that the installation of a burglar alarm system was a sale of "goods" within the meaning of the Uniform Commercial Code. In reaching this conclusion, we focused our attention on the Code's definition of the term "goods." There was no need to consider the definition of the term "sale" because according to the terms of the written contract involved in *Lobianco,* the title of the alarm system passed from Property Protection, Inc. to Ms. Lobianco. In addition, the contract in *Lobianco* did not provide for the periodic repair and maintenance of Ms. Lobianco's alarm by Property Protection, Inc.. These two aspects of the contract in *Lobianco* distinguish it from the lease agreement in this case. Consequently, contrary to the belief of the parties, *Lobianco* does not support the conclusion that the lease agreement in this case was a "sale." *Accord Craig v. American District Telegraph,* 91 Misc.2d 1063, 399 N.Y. S.2d 164 (1977) (no "sale" occurred where alarm system which was installed in plaintiff's premises remained the property of the defendant).

Although we have determined that the lease agreement is neither a "transaction in goods" nor a "sale" within the plain wording of the definitions given in the U.C.C., our analysis of this issue is not yet complete. We must consider whether the provisions of the U.C.C. sales division should be judicially extended to cover transactions in the form of a

lease. *See* R. Duesenberg & L. King, Sales & Bulk Transfers Under the Uniform Commercial Code § 7.01[2] (1987) (there is nothing in the U.C.C. which prohibits courts from extending the application of warranties to leases). Although several trial courts in the Commonwealth have addressed this question, an appellate court has yet to do so. *See Henderson v. Benson–Hartman Motors, Inc.*, 33 Pa.D. & C.3d 6 (1983) (preliminary objection that U.C.C. implied warranty provisions do not extend to lease agreement denied); *Industrial Uniform Rental Co. v. International Harvester Co.*, 6 Phil. 143 (1981) (U.C.C. statute of limitations for breach of warranty cases held applicable to lease transaction); *Bugay v. Pearl*, 2 Pa.D. & C.3d 336 (1976) (warranty provisions of the U.C.C. extended to leased goods); *Grimm v. Scoa Industries*, 9 Pa.D. & C.3d 742 (1979) (implied warranties of the U.C.C. apply to lease transactions in the appropriate circumstances).

We note that a number of jurisdictions have extended the application of Article 2, or at least some of the Articles' provisions, to transactions other than those specifically involving sales. Those that have done so have employed basically three different rationales. *See Glenn Dick Equipment Co. v. Galey Construction, Inc.*, 97 Idaho 216, 220, 541 P.2d 1184, 1188 (1975); R. Alpert & M. Rigg, Sales of Goods and Services 1.2.6 (1982); R. Anderson, *supra*, at § 2–102:11; Comment, *The Extension of Article 2 of the Uniform Commercial Code to Leases of Goods*, 12 Tulsa L.J. 556, 564–570 (1977) (hereinafter *The Extension of Article 2 to Leases*). Some courts have focused on the language of the scope provision of Article 2 which restricts the Article's applicability to "transactions in goods." These courts have reasoned that the term "transaction" is broad enough to include leases. *See Hertz Commercial Leasing Corp. v. Joseph*, 641 S.W.2d 753 (Ky.1982); *Interstate Industrial Uniform Rental Service, Inc. v. F.R. Lepage, Inc.*, 413 A.2d 516 (Me.1980); *Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House*, 59 Misc.2d 226, 298 N.Y.S.2d 392 (1969), *rev'd on other grounds*, 64 Misc.2d 910, 316 N.Y.S.2d 585 (1970). We find

this reasoning illogical. As we noted above, "goods" as defined by Article 2 include only "things which are movable at the time of identification to the contract for *sale* ...," 13 Pa.C.S. § 2105(a). As such, the phrase "transaction in goods" cannot be justifiably interpreted to include leases. Moreover, many of the individual provisions of Article 2 contain terms such as "seller", "buyer", "sale", and "contract for sale." These terms are patently inapplicable to lease transactions. Therefore, even if Article 2 may be held generally applicable to leases under the "transaction" rationale, the specific provisions of Article 2 containing more restrictive terms cannot. *See* R. Anderson, Uniform Commercial Code, *supra,* at § 2–102:11; Comment, *The Extension of Article 2 to Leases, supra,* at 564–565. Courts utilizing this approach seem to be grabbing for straws to support their application of Article 2 to lease transactions. *See* R. Ausness, *Strict Liability for Chattel Leasing,* 48 U.Pitt.L.Rev. 273, 289–290 (1987) ("transaction" approach contradicts the provisions of the UCC and its official comments).

▇▇▇ Other courts have reasoned that when a lease is the functional equivalent of a sale, Article 2 provisions should be applied to the lease by analogy. *See Sawyer v. Pioneer Leasing Corp.,* 244 Ark. 943, 428 S.W.2d 46 (1968): *J.L. Teel Co. v. Houston United Sales, Inc.,* 491 So.2d 851 (Miss.1986). The crucial question for courts utilizing this approach is whether the lease is sufficiently analogous to a sale to warrant the application of similar rules. Comment, *The Extension of Article 2 to Leases, supra,* at 565. Some factors courts consider in reaching such a determination are: the length of the lease term relative to the useful life of the item leased, the presence and characteristics of an option to purchase in a lease, the status of the lessor, and which party is burdened with the incidents of ownership of the goods leased such as the duty to repair, the risk of loss, and the obligation of paying taxes. *See Glenn Dick Equipment Co., supra,* at 1189; *J.L. Teel Co., supra,* at 858; Comment, *The Extension of Article 2 to Leases, supra,* at

565–567. This approach, while extending Article 2 to leases in some situations, precludes its application in other situations where it might be advisable. *See* R. Ausness, *Strict Liability for Chattel Leasing, supra,* at 293 ('analogy to sale' approach too restrictive). In addition, because the decision of whether a lease transaction is analogous to a sale is a factual determination, the parties to a lease transaction in jurisdictions adopting this approach have no certainty regarding which set of rules is applicable to their transaction, those for sales or those for leases. Consequently, we find this method of reasoning infeasible.

Finally, other courts have applied selected provisions of Article 2 to lease transactions by analogy, reasoning that, although the differences between leases and sales weigh against the extension of all of the provisions of Article 2 to leases, leases tend to the same economic result as sales, and further, that the provisions of the Code, besides being statutes concerning sales, embody the foremost modern legal thought concerning commercial transactions. *See W.E. Johnson Equipment Co. v. United Airlines, Inc.,* 238 So.2d 96 (Fla.1970); *All–States Leasing Co. v. Bass,* 96 Idaho 873, 538 P.2d 1177 (1975); *Walter E. Heller & Co. v. Convalescent Home of the First Church of Deliverance,* 49 Ill.App.3d 213, 8 Ill.Dec. 823, 365 N.E.2d 1285 (1977). We find this reasoning and approach persuasive.

Many consumers and businesses are leasing goods rather than buying them. *Cintrone v. Hertz Truck Leasing & Rental Service,* 45 N.J. 434, 448 & n. 1, 212 A.2d 769, 776 & n. 1 (1965); *Hertz Commercial Leasing Corp., supra,* at 395; R. Ausness, *Strict Liability for Chattel Leasing, supra,* at 272–273; Comment, *The Extension of Article 2 to Leases, supra,* at 556–557. By leasing goods, parties achieve substantially the same result as by buying and selling. The essence of both transactions is that the lessee/buyer seeks to acquire the right to use goods and the lessor/sellor seeks to sell the right to use the goods. *Glenn Dick Equipment Co, supra,* at 1190; *Walter E. Heller & Co., supra,* 8 Ill.Dec. 827, 365 N.E.2d at 1289.

By means of a bailment parties can often reach the same business ends that can be achieved by selling and buying. The goods come to the user for the time being and he benefits by their use and enjoyment without the burdens of becoming and remaining the owner. The owner-lessor benefits by receiving the rent for the temporary use. *Cintrone, supra,* 45 N.J. at 447, 212 A.2d at 776 (citations omitted). Considering that a large volume of commercial transactions is being cast in the form of a lease instead of a sale, and that leases reach the same economic result as sales, it would be illogical to apply a different set of rules to leases than to sales where there is no justification for doing so.

However, there are significant differences which make the outright extension of Article 2 to leases impracticle. These differences include transfer of title, incidents of ownership, risk of loss, financial considerations, taxes, and bankruptcy proceedings. Faced with these differences and the fact that Article 2 was designed to govern *sales,* we cannot be certain that the impact of Article 2's provisions on leases would not be obscure or undesirable. In other words, we cannot be certain that we would not be justified in applying some provisions of Article 2 to sales and not to leases. To gain that certainty, we would have to examine each of Article 2's provisions. Given the impossibility of performing this task within one sweeping opinion, we would be remiss in holding Article 2 applicable to leases *in its entirety* at this time. Accordingly, we will analogize the provisions of Article 2 to leases only when the specific provision has been examined and the circumstances of the situation warrant the same treatment for leases which is given to sales. In this case, we must examine Article 2's statute of limitations for breach of warranty actions to determine whether it should be held applicable to leases. Because it would be senseless to apply this limitation provision if Article 2's express and implied warranty provisions are not applicable to leases, we will first examine the applicability of these warranty provisions.

Prior to enactment of the U.C.C., the Uniform Sales Act, 69 P.S. § 1 et seq., adopted in 1915, governed sales. Like Article 2, the Uniform Sales Act contained provisions on warranties. These provisions were held to be equally applicable to lease transactions. *See Demos Construction Co. v. Service Supply Corp.*, 153 Pa.Super. 623, 34 A.2d 828 (1943), *Hartford Battery Sales Corporation v. Price*, 119 Pa.Super. 165, 180 A. 95 (1935); *Crown Printing Co. v. Charles Beck Co.*, 73 Pa.Super. 419 (1920). *See also The White Co. v. Francis*, 95 Pa.Super. 315 (1929) (although not mentioning any provision contained in the Uniform Sales Act, this court held that "[o]ne who lets property for hire may reasonably be subjected to the same implied warranties as one who sells goods"); *Conn v. Hunsberger*, 224 Pa. 154, 73 A. 324 (1909) (when bailor lets horse for hire he impliedly warrants that the animal is fit and suitable for the purpose for which it is hired).

The Uniform Commercial Code was not meant to alter this case law. Comment 2 to section 2313 states:

Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined ... to sales contracts ... the matter is left to the case law with the intention that the policies of this Act may offer useful guidance in dealing with further cases as they arise.

The warranty law which was developed in the aforementioned cases, therefore, still applies to lease transactions. If we refrain from applying the warranty provisions of Article 2 to leases then, leases will be governed by one set of warranty laws while sales will be governed by an entirely separate set. Lessees, however, rely upon the representations made by lessors as to the quality, fitness and merchantability of goods in the same manner and to the same extent as purchasers rely upon such warranties made by sellers:

There is no good reason for restricting such warranties to sales. Warranties of fitness are regarded by law as an incident of a transaction because one party to the relationship is in a better position than the other to know and control the condition of the chattel transferred and to distribute the losses which may occur because of a dangerous condition the chattel possesses. These factors make it likely that the party acquiring possession of the article will assume it is in a safe condition for use and therefore refrain from taking precautionary measure himself.

*Cintrone, supra,* 45 N.J. at 446, 212 A.2d at 775 (citation omitted). *See also* Farnsworth, *Implied Warranties of Quality in Non–Sales Cases,* 57 Colum.L.Rev. 653, 673–674 (1957) ("The expansion of enterprises engaged solely in bailment for hire seems to justify increasing imposition of absolute warranties, at least to the extent that they would be imposed upon a seller of similarly used goods."); Comment, *Warranties in the Leasing of Goods, supra,* at 146 (lessees who rely upon the affirmations of lessors as to the ability of rented goods to perform effectively should have the same protection as buyers who similarly rely upon the affirmations of sellers); Comment, *The Extension of Article 2 to Leases, supra,* at 562 ("The particular circumstances in each case, which determine whether the transaction takes the form of a sale or a lease, do not change the reason for implying warranties. The reliance of the user on the quality and safety of the items furnished is as great in a lease as in a sale.").

 Our supreme court has minimized the importance of the sale-lease distinction in strict liability law. In *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975), the supreme court instructed that:

The term "seller" is used generically to include all suppliers of products who, because they are engaged in the business of selling or supplying a product, may be said to have "undertaken and assumed a special responsibility" toward the consuming public and who are in a position to

spread the risk of defective products. Restatement (Second) of Torts, § 402A, comment c. The actual form of the transactions of such suppliers, whether by sale, lease or bailment, should not alter their obligations.

*Id.* 462 Pa. at 93 n.3, 337 A.2d at 898 n.3. Thereafter, in *Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736 (1977), our supreme court reasoned that "[w]hat is crucial to the rule of strict liability is not the means of marketing but rather the fact of marketing, whether by sale, lease or bailment, for the use and consumption of the public." *Id.* 472 Pa. at 367, 372 A.2d at 738. We find the sale-lease distinction equally unimportant in the area of warranty law; for both leases and sales, there should be one body of warranty law. This will promote uniformity in dealing with commercial transactions whether they be cast in the form of a lease or a sale. Accordingly, we hold that the express and implied warranty provisions of Article 2, specifically sections 2313 and 2314, apply by analogy to leases. *Accord Glenn Dick Equipment Co., supra,* (express and implied warranties); *Owens v. Patent Scaffolding Co.,* 77 Misc.2d 992, 354 N.Y.S.2d 778 (1974), *rev'd on other grounds,* 50 A.D.2d 866, 376 N.Y.S.2d 948 (1975) (implied warranties). *See also* R. Duesenberg & L. King, Sales & Buld Transfers Under the Commercial Code, *supra,* at § 7.01[2] (there is much logic to extending the warranty protection contained in the U.C.C. to leases); 1A Uniform Laws Annotated §§ 2A–210, 2A–213 (Supp.1988) (codification of uniform laws for leases contains provisions for express and implied warranties which are identical to the warranty provisions contained in Article 2 except that they are revised to reflect leasing practices and terminology); Annot., 48 A.L.R.3d 668 at § 6(a) (1973) (application of Code warranties to leases by analogy).

The stage is now set for our determination of whether to extend the application of section 2725, Article 2's statute of limitations for breach of warranty actions, to lease transactions. Although it is not entirely clear, it appears that the provision currently governing the statute of limitations for

breach of warranty actions in lease transactions is 42 Pa. C.S. § 5525, which provides, in pertinent part:

The following actions and proceedings must be commenced within four years:

(1) An action upon a contract, under seal or otherwise, for the sale, construction or furnishing of tangible personal property or fixtures.

\* \* \* \* \* \*

(3) An action upon an express contract not founded upon an instrument in writing.

(4) An action upon a contract implied in law, except an action subject to another limitation specified in this subchapter.

\* \* \* \* \* \*

(8) An action upon a contract, obligation or liability founded upon a writing not specified in paragraph (7) [a negotiable or nonnegotiable bond, note or other similar instrument in writing], under seal or otherwise, except an action subject to another limitation specified in this subchapter.

42 Pa.C.S. § 5525 (1981 & Supp.1987). It would seem that an action founded upon an express warranty would be covered under subsection eight if the warranty is in writing and under subsection three if it is not, and that an action based on an implied warranty would be covered under subsection four, an implied warranty being a promise implied within a contract. *See* 63 Am.Jur.2d *Products Liability* § 450 (1984) (warranties, whether express or implied, are contractual in nature).

 The four years within which the actions listed in section 5525 must be commenced is computed from the time the cause of action accrues. 42 Pa.C.S. § 5502 (1981). An action based on a contract accrues when the contract is breached. *A.J. Aberman, Inc. v. Funk Bldg. Corp.*, 278 Pa.Super. 385, 395, 420 A.2d 594, 599 (1980); 22 Pennsylvania Law Encyclopedia §§ 54, 61 (1959). Unless explicitly referring to the future condition or performance of an item,

an express or implied warranty respecting goods relates to the condition of the item at the time it leaves the warrantor's possession or control. 63 Am.Jur.2d *Products Liability* § 454 (1984). Therefore, except where there is a warranty of future condition or performance, the warranty is breached when goods, or whatever interest in the goods is at issue, is transferred to the user in a condition other than that which was warranted. *See Woodland Oil Co. v. A.M. Byers & Co.*, 223 Pa. 241, 72 A. 518 (1909) (breach of warranty in sale of defective goods begins to run, not when actual consequential damages are suffered, but at time of sale because that is when warranty is broken); 63 Am. Jur.2d *Products Liability* § 913 (1984). In summary, then, the four year statute of limitations for breach of warranty actions established in section 5525 would begin to run, except in cases where the warranty extended to the future condition or performance of the goods, at the time the interest in the goods which the lessee has bargained for is transferred over to him.

 Under section 2725, Article 2's statute of limitation provision for breach of warranty actions, an action must be commenced within four years after tender of delivery is made; however, if the warranty explicitly extends to future performance of the goods and discovery of the breach must await future performance, the cause of action must be commenced within four years after the breach is or should have been discovered. 13 Pa.C.S. § 2725 (1984). In substance, then, the statute of limitations for breach of warranty actions provided under 13 Pa.C.S. § 2725 and 42 Pa.C.S. § 5525 are basically the same. Accordingly, we see no justification for treating breach of warranty actions in lease transactions under 42 Pa.C.S. § 5525 rather than 13 Pa.C.S. § 2725. Section 2725 specifically addresses breach of warranty actions within its subsections and thus makes its application to warranty actions straightforward. Section 5525, on the other hand, applies only generally to contract actions, thus necessitating further research for instruction on how to apply the limitation

provision to warranty actions in particular. Our legislature has directed that special statutory provisions are to be given effect over general statutory provisions. *See* 1 Pa. C.S. § 1933 (Supp.1987) (special statutory provisions prevail over general statutory provisions); *Commonwealth v. Soltis*, 311 Pa.Super. 195, 457 A.2d 562 (1983). Section 2725, therefore, prevails over section 5525 in breach of warranty actions. By extending the coverage of 2725 to warranty actions involving lease transactions, we avail ourselves of the abundance of case law that has been generated concerning the application of the statute of limitations in warranty actions. Morever, we reach the logical conclusion that Article 2's statute of limitations applies to actions for breach of Article 2's warranty provisions rather than the general contract statute of limitations contained in section 5525.

Having determined that 13 Pa.C.S. § 2725 applies to breach of warranty actions in lease transactions, we must now apply the limitation provision to the case at bar. The alarm system was installed in the Cucchis' residence in 1973. Delivery of the alarm system was, therefore, tendered in 1973. This date of delivery is not affected by the fact that the lease of the alarm system was continually renewed every time the Cucchis made another payment to Rollins or that Rollins periodically made repairs on the alarm system and replaced some of its parts. Only if Rollins had repossessed the alarm system and then reinstalled it or another system in the Cucchis' home every time the Cucchis renewed their lease would the warranties begin anew with the Cucchis' renewals of their lease. Any other method of reasoning would unfairly expose lessors to far greater liability than sellers. Moreover, any defect in the operation of the alarm system attributable to the parts in the alarm which were replaced or to the work which was done when Rollins repaired the system is entirely irrelevant to the Cucchis' cause of action for breach of warranty. Such a defect, instead, would pertain to a cause of action based on Rollins' duty to repair the system.

Furthermore, Rollins' express warranty, that the system would provide "safety," did not explicitly relate to the future performance or condition of the alarm system. Rollins' statement regarding the system, rather, related to the good at the time it was leased to the Cucchis or installed in their residence. Likewise, the implied warranty of merchantability pertained to the condition of the alarm system when it was first installed in the Cucchis' home.

In *Patton v. Mack Trucks, Inc.*, 360 Pa.Super. 1, 519 A.2d 959 (1986), a case also based on breach of express and implied warranties, Mr. Patton was injured when a truck, which his employer had purchased from Mack Trucks, Inc. (Mack), spun out of control due to a defect in the steering mechanism. On the purchase order for the truck, Mack had warranted that "all articles and services covered by this purchase order meet or exceed the regulations established and promulgated under the Federal Occupational Safety and Health Law...." *Id.* 360 Pa.Super. at 4, 519 A.2d at 961. The issue on appeal was whether the Pattons' cause of action for breach of warranty accrued in 1977, when Mack delivered the truck to Mr. Patton's employer, or in 1981, when the accident that injured Mr. Patton occurred. The Pattons argued that the cause of action accrued on the later date because the warranty language would be rendered meaningless unless the warranty was held to "implicitly extend" to future performance. This was so, the Pattons contended because: (1) Mack had warranted to provide his employer's employees with a workplace that conformed to existing federal safety standards and, therefore, the warranty had meaning only if it extended into the future to cover the period during which the truck actually served as a workplace for the employees; and (2) until the time of the accident, they could not possibly have discovered Mack's breach of the warranty. In holding that the cause of action accrued in 1977, we rejected both of these arguments. We stated:

> We ... must reject the argument that a warranty necessarily extends to future performance merely because it

contains promises regarding the manner in which the goods will perform after tender of deliver. [sic] The same argument applies to nearly all warranties. If we held that the warranty in the case "explicitly extended" to future performance, we would allow the exception to swallow the rule. Commonplace warranties such as those which guarantee the number or quality of widgets a particular machine can produce or the number of pounds a particular truck can haul all would "explicitly extend" to future performance. The drafters of the Code could not have intended this result. ... We must also reject the related argument that a warranty necessarily extends to future performance when the aggrieved party cannot possibly discover the breach until after tender of delivery. We certainly agree that ... Mr. Patton could not reasonably have ascertained the condition of the steering mechanism before it failed. Nonetheless, Section 2725(b) provides that a cause of action accrues "regardless of the aggrieved party's lack of knowledge of the breach." ... A cause of action accrues upon discovery of breach only if the warranty "explicitly extends" to future performance. Otherwise, the aggrieved party's knowledge or ability to know is irrelevant.

*Id.* 360 Pa.Super. at 9–11, 519 A.2d at 964–65. We find our reasoning and conclusions in *Patton* equally applicable in the case at hand. Accordingly, we hold that the four year statute of limitations started to run on the Cucchis' breach of warranty action when the alarm was delivered to the Cucchis in 1973. Since the Cucchis' complaint was not filed until October 30, 1985, their cause of action against Rollins was indeed barred by the statute of limitations. We must, therefore, vacate the judgment entered in favor of the Cucchis.

Based on the foregoing discussion, we vacate the judgment entered in the Court of Common Pleas of Delaware County and dismiss the Cucchis' breach of warranty action against Rollins.